**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 21 B 10216 |
| | ) | |
| PETER J. SZAFRANIEC, | ) | Chapter 13 |
| | ) | |
| Debtor. | ) | Judge David D. Cleary |

**MEMORANDUM OPINION**

This matter comes before the court on the Amended Objection to Confirmation of the Plan ("Objection") filed by Marilyn O. Marshall, Standing Trustee ("Trustee"). The Trustee objected to confirmation of the plan (the "Plan") proposed by Debtor Peter J. Szafraniec ("Debtor"). The court entered a scheduling order allowing the Trustee time to file an amended objection. She did so, objecting to the Plan on the grounds that Debtor did not propose it in good faith and that he failed to contribute all of his projected disposable income. Debtor filed a response, and the court entered a pretrial order setting the matter for an evidentiary hearing. The court conducted the hearing on March 28, 2022, at which Debtor was the only witness. The parties filed simultaneous post-trial briefs on April 14, 2022.

Having heard the arguments of the parties, reviewed the papers submitted and considered Debtor's testimony, the court will overrule the Objection.

**I.      BACKGROUND**

Debtor is a machinery and equipment appraiser who operates his own business, Arrow Valuation LLC. He submitted a spreadsheet of the income and expenses for the business, as well as a record of the amount earned at a second job he recently started as a package delivery driver. **Debtor Ex. 3**. Debtor's business has been steady since he filed this case, although there have been ups and downs, similar to his normal periods of employment.

Until the week before the evidentiary hearing in this matter, Debtor lived at 245 North Knight Avenue in Park Ridge, Illinois ("Knight House") with his spouse ("Julie") and two children. Debtor and Julie are separated and have been so since April 2020.

When they separated, Debtor and Julie initially agreed that he would stay in the Knight House. Julie would pay the expenses and Debtor would give her $2,000 every month. He was unable to pay $2,000 consistently each month, but over time he tried "to catch up to that number." The $2,000 was meant to cover Debtor's half of the $2,500 mortgage payment, utilities and children's expenses as well as an informal lease of a vehicle in Julie's name with a contribution toward the car insurance. Although the gas, electricity and phone bills were in Debtor's name, Julie "took the responsibility of paying, and [Debtor's] assumption was that they were taken out of the funds that [he] was giving to her."

Debtor is still covered by Julie's health insurance. He has done some preliminary research to find a new plan and is informed that COBRA coverage is available at $413 per month. He included that $413 expense on his most recent Schedule J, filed with an amended Schedule I just before the evidentiary hearing.

While Debtor and Julie were separated but both living in the Knight House, Debtor slept in a guest bedroom, spent most of his time in the home office and used the basement for recreation. He avoided the main floor except for eating and interacting with the children. Julie slept in the master bedroom. Debtor and Julie had been sleeping in separate rooms for nearly three years at the time of the evidentiary hearing.

Julie consulted a divorce attorney first and suggested a collaborative divorce. Debtor hired attorney Brad Pawlowski on May 11, 2021. **Debtor Ex. 1**. Debtor has worked with

2

attorneys, experts and therapists in the divorce case and reached an agreement with Julie, but final resolution of the divorce is now dependent on the outcome of this bankruptcy case.

Debtor first considered filing for relief under the Bankruptcy Code in 2018. He eventually filed for relief under chapter 13 on August 31, 2021.

Debtor moved to 4655 North Cumberland Avenue in Norridge, Illinois ("Cumberland Apartment") just before the evidentiary hearing. He lives in the Cumberland Apartment with his father and his children will stay there some of the time. He and his father agreed that Debtor would pay $550 toward the rent. Heat and gas are included, but Debtor also pays $64 for internet service and $120 for his cell phone. Now that he moved out of the Knight House, he and Julie agreed to abide by the contributions agreed to in the draft Marital Settlement Agreement. **Debtor Ex. 2**. As stated in his most recent Schedule J, Debtor will pay Julie $800 in child support, $300 for the Honda Pilot that she owns but he drives, and approximately $110 for car insurance.

## II.    LEGAL DISCUSSION

Debtor seeks to confirm his chapter 13 plan, which requires that he satisfy each element of 11 U.S.C. § 1325(a). He bears the burden of establishing by a preponderance of the evidence that the requirements for confirmation of the proposed plan have been met. *See In re Shelton*, 592 B.R. 193, 201 n.5 (Bankr. N.D. Ill. 2018); *In re Hauter*, No. 10-70234, 2010 WL 4115476, at *2 (Bankr. C.D. Ill. Oct. 18, 2010).

A. **Debtor established by a preponderance of the evidence that he proposed his plan in good faith**

The Trustee objected to confirmation on the grounds that Debtor did not meet the requirement in § 1325(a)(3) that he propose his plan in good faith.

In considering whether a plan is filed in good faith, the court asks of the debtor: 'Is he really trying to pay the creditors to the reasonable limit of his ability or is

3

he trying to thwart them?' …. Whether a plan or petition is filed in good faith is a
question of fact based on the totality of the circumstances surrounding the
proposed plan.

*In re Smith*, 286 F.3d 461, 466 (7th Cir. 2002) (quoting *In re Schaitz*, 913 F.2d 452, 453 (7th Cir.

1990)).

The Trustee contends that to determine whether Debtor has acted in good faith, this court

should consider misstatements and omissions in the plan, "the debtor's motive in filing the

petition … and whether the debtor has been forthcoming with the bankruptcy court and the

creditors." *Matter of Love*, 957 F.2d 1350, 1357 (7th Cir. 1992). *See* Trustee's Post Trial Brief,

at 5. The gist of her good faith objection focuses on "the question of whether the debtor has fully

disclosed all income available to general unsecured creditors." *Id.* at 1.

The Trustee asserted that "[a]t the March 28, 2022, evidentiary hearing, the debtor's

testimony contradicted the schedules filed under oath with the petition for relief under the

bankruptcy code." *Id.* at 2. Technically the Trustee is correct. In his original Schedule I, Debtor

stated that he received payments each month from Julie in the amount of $1,250. His testimony,

however, was that he paid Julie $2,000 each month and that she paid all household expenses.

This summary, however, does not present the whole picture. In his original Schedule J,

Debtor included the entire $2,500 mortgage payment as an expense. He testified that when he

lived in the Knight House, which he did when he filed this case in August 2021, he gave Julie

$2,000 each month for several expenses, including his half of the $2,500 mortgage payment.

Perhaps a different representation of the allocation of expenses between Debtor and Julie would

have made this clear. But the result is the same; Debtor was responsible for $1,250 of the

monthly mortgage payment when he lived in the Knight House.

Unfortunately, divorce and bankruptcy sometimes overlap. And the reality of how

debtors and their soon-to-be ex-spouses arrange their financial situation while the divorce is

4

proceeding can be messy.  The situations do not always lend themselves to a perfect representation on the fixed line items in Schedules I and J.  As a below-median debtor, however, Debtor's "expenses are not limited to the expenses shown on Schedule J.  Section 1325(b)(2) nowhere mentions Schedule J, and a debtor is entitled to deduct expenses that do not appear on Schedule J as long as they are 'reasonably necessary' for the support of the debtor or his dependent." *In re Forbish*, 414 B.R. 400, 404 (Bankr. N.D. Ill. 2009) (citations omitted),

The Trustee also questioned the Debtor's good faith for failing to include Julie's income when calculating the funds available for unsecured creditors.  "To what extent should the spouse's income be included in the disposable income calculation?  To what extent is the non-filing spouse's income available to defray expenses, thus freeing a larger portion of the debtor's income to pay unsecured creditors?"  Trustee's Post Trial Brief, at 2.

Having heard directly from the Debtor on both direct and cross examination, the court has no doubt that he and Julie are in the middle of a divorce.  His testimony that they separated in April 2020, even though they both continued to live in the Knight House, was credible.  Debtor slept in a guest bedroom and avoided the main floor except for eating and interacting with the children.  Julie slept in the master bedroom.  In fact, Debtor and Julie had been sleeping in separate rooms for nearly three years at the time of the hearing.  The circumstances of Debtor's living arrangements do not call his good faith into question.  Debtor testified in a candid and forthright manner.  The court found him to be a credible witness.

Earlier in this case, the parties focused on whether Debtor and Julie were living "separate and apart."  The resolution of this issue goes both to the question of Debtor's good faith and whether he is committing all disposable income to the plan.  The court will address the issue below, in its disposable income analysis.  In the meantime, having heard and reviewed the

5

Debtor's testimony, the court is left with the firm impression that he has been forthcoming with the facts regarding his income and expenses, his living situation and the divorce. The court is mindful that it is the totality of the circumstances which are most important, rather than the mechanics of his financial arrangements with his soon-to-be ex-spouse. Having considered all of the circumstances, the court finds that Debtor established by a preponderance of the evidence that he proposed this plan in good faith.

**B. Debtor's plan provides for all of his projected disposable income to be applied to make payments to unsecured creditors**

**1. Standard for determining projected disposable income**

In addition to resolving the good faith objection, the court must also consider 11 U.S.C. § 1325(b):

> (b)(1)   If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan--
>
> > (A)     the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
> >
> > (B)     the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

The Trustee refers to this requirement as the "best efforts test." "If the plan proposed by a debtor cannot meet the best effort test, the plan cannot be confirmed." *In re Gilliam*, 227 B.R. 849, 851 (Bankr. S.D. Ind. 1998).

Debtor does not propose to pay his unsecured creditors in full, which would meet the test under § 1325(b)(1)(A). Therefore, he must satisfy § 1325(b)(1)(B) and demonstrate by a preponderance of the evidence that all of his projected disposable income during the plan term is being committed to those unsecured creditors.

A debtor's projected disposable income is essentially "current monthly income less amounts reasonably necessary to be expended for maintenance or support, business expenditures and certain charitable contributions." *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 65 (2011) (quotations omitted). What amount is "reasonably necessary to be expended for maintenance or support" will be calculated differently depending on where the debtor falls in regard to the median.

Above-median debtors are allowed only to take the expenses described on the means test. 11 U.S.C. §§ 1325(b)(3); 707(b)(2). Debtor is a below-median debtor, and therefore can deduct "the full amount needed for maintenance or support," *Hamilton v. Lanning*, 560 U.S. 505, 510 (2010), without reference to the limits in the means test. Unfortunately, "Congress's silence with respect to how below-median debtors must determine their reasonably necessary expenses is deafening." *In re Orozco*, 613 B.R. 23, 28 (Bankr. D. Or. 2020).

> What is "reasonably necessary" is a question of fact for which the outcome can vary from judge to judge and jurisdiction to jurisdiction. Determining what is "reasonably necessary" and what is not requires the court to engage in the unenviable task of scrutinizing the debtor's schedule of income and expenditures. There is no bright line rule for determining what is "reasonably necessary." Because there is no precise standard, some courts have strictly scrutinized expenses, some have been more deferential to the debtor, and most have settled at a [sic] some median between these two extremes.

*In re Nicola*, 244 B.R. 795, 797 (Bankr. N.D. Ill. 2000) (quotation and citations omitted).

### 2. Debtor established by a preponderance of the evidence that his separated spouse's income need not be included in the calculation of his projected disposable income

The court will first return to the dispute over whether Julie's income should be included in the calculation of Debtor's disposable income.

> The theory … is that the non-filing spouse's income is available to defray the Debtor's reasonably necessary expenses, thus freeing a larger portion of the Debtor's separate income for satisfaction of unsecured claims and that it would be unfair to allow the Debtor's separate income to be used for the family necessities and not count a non-filing

spouse's income which would remain "disposable" to the Debtor and uncommitted to the plan.

*In re Ortiz-Feliciano*, 532 B.R. 185, 191 (Bankr. D.P.R. 2015).

To resolve this dispute, both parties focused on the test in 11 U.S.C. § 707(b)(7)(B).  In that subsection, the Bankruptcy Code provides two instances where the income of a debtor's non-filing spouse is not included in the calculation of a debtor's current monthly income: (1) if the debtor and his spouse are separated under applicable nonbankruptcy law; or (2) if the debtor and his spouse are living separate and apart other than for the purpose of evading a motion to dismiss for abuse under § 707(b)(2).

The parties' reliance on this test begs the question of whether § 707(b)(7)(B) is applicable in chapter 13.  It is not.  *See* 11 U.S.C. § 103(b) ("Subchapters I and II of chapter 7 of this title apply only in a case under such chapter."). When asking whether Julie's income should be included in Debtor's current monthly income, the answer is found in the Bankruptcy Code's definition of "current monthly income."  11 U.S.C. § 101(10A).  In that definition, Congress stated that a debtor's current monthly income "includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents[.]" Therefore, if Julie pays any amount on a regular basis for Debtor's household expenses, then those payments are included in Debtor's current monthly income.

In other words, current monthly income includes a non-filing spouse's income to the extent the spouse's income is paid on a regular basis for the household expenses of the debtor or his dependents.  *See In re Baker*, 580 B.R. 662, 665 (Bankr. E.D. Va. 2017).  "Most notably, the definition departs from prior practice by excluding the income of a non-filing spouse to the extent that it is not regularly paid for the household expenses of the debtor or the debtor's

dependents." *In re Johnson*, 400 B.R. 639, 643 (Bankr. N.D. Ill. 2009) (footnote omitted), *aff'd*,

382 F. App'x 503 (7th Cir. 2010).

> In apparent recognition that not all married couples adhere to the traditional model of an economic partnership, the income of a non-filing spouse is included only to the extent that it is regularly paid for the household expenses of the debtor or the debtor's dependents. *See In re Welch*, 347 B.R. 247 (Bankr. W.D. Mich. 2006) (characterizing treatment of all couples as marital unit with pooled income and shared expenses as outdated). Thus, under the statute, a non-filing spouse's income is divided into two parts: income that is regularly contributed for the support of the debtor and dependents, and income that is not regularly contributed, with regular contributions by the non-filing spouse being treated no differently from contributions by any other third party.

*In re Clemons*, No. 08-82968, 2009 WL 1733867, at *3 (Bankr. C.D. Ill. June 16, 2009)

(footnote omitted).

The court heard testimony that when both she and Debtor lived in the Knight House, Julie paid all the expenses for herself, Debtor and their dependents. He contributed $2,000 each month toward those expenses. This contribution was meant to cover half of the mortgage payment, utilities and children's expenses as well as an informal lease of a vehicle in Julie's name. To the extent that Julie is paying for the household expenses of Debtor and the children, and Debtor's $2,000 contributions did not cover the expenses, Julie's payments could be included in the Debtor's current monthly income. But those payments are not available to unsecured creditors during a plan because Debtor is entitled to deduct those reasonably necessary expenses back out from his current monthly income to determine his projected disposable income.

Having reviewed Debtor's original and amended Schedules I and J, the court finds no showing that Debtor and Julie arranged that he would pay more than his share of the household expenses so they could shelter her income from his unsecured creditors in his bankruptcy case. Debtor's $2,000 monthly contribution was meant to include half of a $2,500 mortgage payment,

9

leaving only $750 for utilities, food, transportation, insurance and other expenses for himself and two children.  It does not appear that Debtor's separate income was being used unfairly for the family necessities while Julie's income remained "disposable" to the Debtor.

> **3. Debtor established by a preponderance of the evidence the existence of the amounts reasonably necessary to be expended for the maintenance or support of himself and his dependents**

The Trustee also argued that Debtor is not committing all disposable income because he "failed to establish by [a] preponderance of the evidence where he actually lives and what his living expenses actually are at this time….  The only evidence of living expenses presented [is] Debtor's exhibit D2….  The xfinity bill of $64 per month for cable and internet[.]" Trustee's Post-Trial Brief, at 3.

As for where he actually lives, Debtor testified that about a week before the evidentiary hearing, he moved into the Cumberland Apartment where he now lives with his father.  It is not necessary to have documentary evidence of a fact when a witness can testify to that fact from personal knowledge.  F.R.E. 602.  The amended Schedules I and J filed before the evidentiary hearing also support the Debtor's testimony that he no longer lives at the Knight House.  His housing expense decreased to $550, and when provided with an opportunity for further explanation at line 24 of Schedule J, Debtor wrote that his "budget is updated to reflect … moving to his father's residence full time starting April 1 2022."  Schedules are signed under penalty of perjury, Fed. R. Bankr. P. 1008, and in this case are corroborated by the testimony.

Regarding his current living expenses, Debtor has the burden of showing that an expense is reasonable and necessary.  *See Ransom*, 562 U.S. at 71 n.5 ("Because the means test does not apply to Chapter 13 debtors whose incomes are below the median, those debtors must prove on a case-by-case basis that each claimed expense is reasonably necessary.").  As Debtor explained, his "current household expenses are admittedly in a state of flux….  [H]is divorce is not

10

finalized, nor are the final amounts agreed to for his expected child support, and health insurance." Debtor's Post Trial Brief, at 5-6. Schedule J asks debtors to estimate their expenses. "These expenses must undergo judicial analysis, in the face of an objection, as to reasonableness and necessity; or as some might say, 'the old fashion way.'" *In re Cleary*, 357 B.R. 369, 372–73 (Bankr. D.S.C. 2006).

*Lanning* tells us that "in exceptional cases, where significant changes in a debtor's financial circumstances are known or virtually certain, a bankruptcy court has discretion to make an appropriate adjustment." 560 U.S. at 513. Although *Lanning* involved an above-median debtor, "the *Lanning* Court's reasoning applies with equal force to below-median income debtors." *Marshall v. Blake*, 885 F.3d 1065, 1078 (7th Cir. 2018), *overruled on other grounds by In re Wade*, 926 F.3d 447 (7th Cir. 2019). In this case, significant changes to Debtor's financial circumstances compared to the beginning of the case in August 2021 are virtually certain. He testified credibly that he is in the middle of a divorce.

Indeed, there is no requirement that the expenses a debtor claims must be his exact, actual expenses.

> [Section] 1325(b)(2) says nothing of "actual" expenses; it merely describes "amounts *reasonably necessary* to be expended ... for the maintenance or support of the debtor or a dependent of the debtor." 11 U.S.C. § 1325(b)(2) (emphasis added). Notably, several other provisions of the Bankruptcy Code use the word "actual" when describing expenses. *See, e.g.*, 11 U.S.C. §§ 330(a)(1)(B) (allowing a court to award the trustee "reimbursement for actual, necessary expenses"), 1329(a)(4) (allowing for modification of the plan after confirmation to reduce payments "by the actual amount expended by the debtor to purchase health insurance"). Accordingly, we must presume Congress acted intentionally by omitting the word "actual" when describing the kinds of expenses that debtors may deduct from their CMI when calculating projected disposable income.

*Marshall v. Blake*, 885 F.3d at 1081.

Debtor included the following expenses on Schedule J:

| Expense | Amount | Explanation |
|---|---|---|
| Rent or home ownership | $550 | Debtor testified that he and his father agreed on rent in the amount of $550.  Heat and gas are included. |
| Telephone/cellphone/internet/cable | $229 | Debtor testified that he pays $120 for his cell phone and $64 for internet service.  Debtor did not explain the additional $45. |
| Food and housekeeping supplies | $300 | In the court's discretion this is a reasonable and necessary amount for food. |
| Clothing, laundry and dry cleaning | $50 | In the court's discretion this is a reasonable and necessary amount for clothing. |
| Personal care products and services | $50 | In the court's discretion this is a reasonable and necessary amount for personal care products. |
| Medical and dental expenses | $47 | In the court's discretion this is a reasonable and necessary amount for medical and dental expenses not covered by insurance. |
| Transportation | $200 | In the court's discretion this is a reasonable and necessary amount for transportation. |
| Life insurance | $75 | The draft marital settlement agreement requires maintenance of a $500,000 life insurance policy. |
| Health insurance | $413 | Debtor testified that the financial expert involved in his divorce quoted a cost of $413 for COBRA coverage once he is no longer a beneficiary of Julie's policy. |
| Vehicle insurance | $110 | Debtor testified that he would pay Julie a contribution for vehicle insurance. |
| Car payments | $300 | Debtor testified that he has "an informal verbal agreement" with Julie to pay her $300 for the use of her Honda Pilot |
| Child support | $800 | This is the amount agreed to in the draft marital settlement agreement. |

Some of these expenses were reviewed "the old fashion[ed] way," by using judicial experience and common sense. "If a debtor's income is below the median income for the size of his family in his state of residence, the court has more discretion to determine disposable income than if his income is above the state's median." *In re Rekucki*, No. DK 20-01803, 2020 WL 6105810, at *3 (Bankr. W.D. Mich. Oct. 15, 2020). The Code does not provide a bright line rule for below-median debtors' expenses, as it does for above-median debtors. Instead, "[w]hat is 'reasonably necessary' is a question of fact for which the outcome can vary from judge to judge and jurisdiction to jurisdiction." *In re Hansen*, 244 B.R. 799, 801 (Bankr. N.D. Ill. 2000). The expenses that Debtor claimed for food, clothing, personal care products, medical and dental items and transportation are not unreasonable, and such expenses are generally necessary for any debtor's maintenance and support. *See In re Bonuchi*, 327 B.R. 428, 433 (Bankr. W.D. Mo. 2005) (using case law under § 1325(b)(2) to interpret a Missouri statute that exempts annuity payments to the extent reasonably necessary for support, and stating that "[s]ome expenditures, such as those for food, clothing, shelter and the like are clearly essential").

Other expenses were supported by the testimony or the draft marital settlement agreement admitted into evidence. Overall, Debtor has shown by a preponderance of the evidence that his claimed expenses are reasonable and necessary. To the extent there is a $45 discrepancy for which the Debtor did not provide any justification, the court makes "the sensible recognition that, to succeed in a chapter 13 case, a debtor must have some flexibility in his budget." *In re Morales*, 563 B.R. 867, 875 (Bankr. N.D. Ill. 2017) (discussing case law holding that chapter 13 debtors may keep all or a portion of their tax refund to cover unplanned expenses).

### 4. Debtor established the amount of his income by a preponderance of the evidence

Finally, the Trustee argues that the amended Schedule I filed just before the evidentiary hearing is not a true and accurate reflection of Debtor's income. Trustee notes that "debtor's

13

business income was reduced from $6,025.14 to $3,424.61" and that "there was no basis established at trial to support any reduction of the debtor's income."  Trustee's Post-Trial Brief, at 3.

Debtors are entitled to amend their schedules; Fed. R. Bankr. P. 1009 contemplates that they will do so.  In fact, the original Schedule I did not include any operating expenses for Debtor's business, Arrow Valuation.  The gross monthly receipts for Arrow Valuation at the time of filing were $6,025.14.  To compare apples to apples, the court must look at the gross receipts on the amended Schedule I for the business, which is $4,986.04.  This gross receipts figure is supported by the exhibit admitted into evidence as Debtor's Exhibit 3.  In January and February 2022, Debtor's invoices totaled $9,972.07, so his gross receipts for those two months was $4,986.04. As Debtor argued, he "amended schedules to reflect his current earnings and expenses as of March 2022."  Debtor's Post Trial Brief, at 5.

In fact, Debtor began making package deliveries in order "to help augment his income during the slow periods for his primary job at Arrow Valuation LLC[.]" *Id.*  Taking on a second job supports the court's earlier finding that Debtor is "really trying to pay the creditors to the reasonable limit of his ability[.]" *Smith*, 286 F.3d at 466 (quotation omitted).  *See, e.g., In re Wrobel*, 525 B.R. 211, 217 (Bankr. W.D.N.Y. 2015) (to overcome a feasibility objection, while "the Court may not force a debtor to take a second job … debtors here make … offers to work longer hours, to take on a second job[.]").

Debtor also established that his net monthly income from Arrow Valuation is $3,122.10. Starting with gross monthly income of $4,986.04, Debtor documented in Exhibit 3 the following business expenses in January and February 2022:  $837.66 in unreimbursed expenses for certain jobs; taxes in the amount of $1,612.47; and recurring expenses such as professional

14

organizations and insurance in the amount of $1,277.74. The total of these expenses, divided by two, is $1,863.94. Gross monthly income of $4,986.04 less monthly expenses of $1,863.94 totals net monthly income from Arrow Valuation in the amount of $3,122.10. When added to the net monthly income in January and February 2022 from Debtor's second job as a package delivery driver, the total net monthly income is $3,424.61.

While this amount is less than the amount in the original Schedule I, the documentary and testamentary evidence submitted at the hearing supports the finding that as of March 2022 Debtor's net monthly income is $3,424.61. Therefore, Debtor established by a preponderance of the evidence that the income disclosed on his amended Schedule I is accurate.

### III.   CONCLUSION

For all of the reasons stated above, the court finds that Debtor's plan was proposed in good faith and commits all projected disposable income to his unsecured creditors. An order will be entered overruling the Trustee's objection to confirmation.

smb

Date:   May 27, 2022

_____
DAVID D. CLEARY
United States Bankruptcy Judge